# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## OPINION

In re: SPANSION INC., et al.

| | |
|---|---|
| AD HOC COMMITTEE OF CONVERTIBLE NOTEHOLDERS, et al., | |
| Appellants, | Civil No. 10-369 (RBK) |
| v. | Bankruptcy Case No. 09-10690 |
| SPANSION, INC., et al., | |
| Appellees. | |
| AD HOC COMMITTEE OF CONVERTIBLE NOTEHOLDERS, et al., | |
| Appellants, | Civil No. 10-385 (RBK) |
| v. | Bankruptcy Case No. 09-10690 |
| SPANSION, INC., et al., | |
| Appellees. | |

**KUGLER**, United States District Judge:

This matter comes before the Court on appeal by an ad hoc group of certain holders of subordinated debentures issued by Spansion LLC (the "Convert Committee") from a decision by the United States Bankruptcy Court for the District of Delaware. Presently before the Court is

the motion to dismiss the appeal filed by Appellees[1] on the grounds of equitable mootness. For the reasons set forth below, the Court will **GRANT** Appellees' motion to dismiss.

## I.    BACKGROUND

### A. The Parties

Appellees design, develop, manufacture, license, and sell flash memory solutions. On March 1, 2009, Appellees filed a petition for relief under Title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. § 101 et seq., in the United States Bankruptcy Court for the District of Delaware (the "Petition Date"). The Convert Committee is an ad hoc group of certain holders of subordinated debentures issued by Spansion LLC prior to the Petition Date (the "Subordinated Notes").[2]

### B. The Proposed Plan

Between March 1, 2009 and December 17, 2009, Appellees negotiated extensively with their creditors. As a result of those efforts, on December 17, 2009, Appellees filed the Debtors' Second Amended Joint Plan of Reorganization (Doc. No. 2032) (the "Proposed Plan") and an accompanying disclosure statement (Doc. No. 2034) (the "Disclosure Statement").[3] (Appellees' Br. App. Ex. 1). Thereafter, on December 18, 2009, the Bankruptcy Court entered an order approving the Disclosure Statement (Doc. No. 2042).

---

[1] The reorganized debtors in this case are: (1) Spansion Inc., a Delaware corporation; (2) Spansion Technonogy LLC, a Delaware limited liability company; (3) Spansion LLC, a Delaware limited liability company; (4) Cerium Laboratories LLC, a Delaware limited liability company; and (5) Spansion International, Inc., a Delaware corporation.

[2] The original appellants in this matter were: (1) the Convert Committee; (2) Tejas Securities Group Inc. ("Tejas"); and (3) the John Gorman 401(k) (the "Gorman 401(k)"). However, on April 27, 2011, Tejas and the Gorman 401(k) voluntarily withdrew their appeal. (Doc. No. 66).

[3] This Opinion frequently refers to the district court docket and the bankruptcy court docket. The district court docket contains documents filed in the appeal before this Court, In re Spansion, Inc. et al., No. 10-369. The Opinion cites all references to the district court docket as "(District Court Doc. No. __)." The bankruptcy court docket contains all documents filed in the proceedings before the bankruptcy judge, In re Spansion, Inc. et al., No. 10-10690. The Opinion cites all references to the bankruptcy docket as "(Doc. No. __)."

The Proposed Plan recommended a complete overhaul of Appellees' financial structure and corporate governance. In particular, it proposed to, among other things: (1) repay more than $630 million in secured claims; (2) cancel Appellees' pre-bankruptcy common stock; (3) issue new common stock (the "New Common Stock") to holders of general unsecured claims; (4) cancel significant intercompany indebtedness; (5) replace Appellees' board of directors; (6) amend Appellees' governing documents; (7) assume or reject hundreds of contracts; and (8) pay priority and administrative claims in cash. (Appellees' Br. App. Ex. 1 at 39, 46, 50-51, 62-64; Appellees' Br. App. Ex. 8 at 988, 998-99, 1003-1004, 1015-17). To provide financing for those transactions, the plan proposed to create a $450 million secured credit facility (the "Credit Facility") and offer $109 million worth of New Common Stock (the "Rights Offering"). The Rights Offering was open to unsecured creditors and supported by Silver Lake Sumeru, L.P. ("Silver Lake").

The Proposed Plan also created the following four classes of general nonpriority unsecured claims: (1) Class 6 claims, which consisted of unsecured claims in an amount less than, or reduced to, $2,000.00; (2) Class 5A claims, which consisted of claims arising from the 11.25% senior notes of Spansion LLC (the "Senior Notes"); (3) Class 5C claims, which arose from the Subordinated Notes; and (4) Class 5B claims, which consisted of all other allowed general non-priority unsecured claims. (Appellees' Br. App. Ex. 1 at 53; Appellees' Br. App. Ex. 8 at 994-95). All voting classes, except Class 5C, voted in favor of implementing the Proposed Plan. (Appellees' Br. App. Ex. 5).

On January 22, 2010, the Convert Committee filed a motion to vacate the Disclosure Statement Order and appoint a trustee or examiner (the "Motion to Vacate"). The Convert Committee also filed two objections to the Proposed Plan. (Doc. Nos. 2479, 2715).

The Bankruptcy Court conducted a five-day hearing from February 25, 2010 to February 29, 2010 to consider whether to confirm the Proposed Plan and how to decide the Motion to Vacate. During the proceedings, the Bankruptcy Court heard testimony from eight witnesses, including Mr. Morgner, the Convert Committee's valuation expert, and two other valuation experts, and considered thousands of pages of documentary evidence. On April 1, 2010, the Bankruptcy Court issued its Opinion on Confirmation (Doc. No. 3224) (the "April 1 Opinion"), (Appellees' Br. App. Ex. 6), and an accompanying Order (the "April 1 Order"), (Appellees' Br. App. Ex. 7). In the April 1 Opinion, the Court denied the Motion to Vacate, and determined that Appellees' enterprise value was between $872 million and $944 million. However, the Bankruptcy Court ruled that it could not confirm the Proposed Plan unless Appellees: (1) revised the Proposed Plan's third-party release; (2) established a reserve for a disputed administrative claim, and (3) revised the Proposed Plan's employee equity program.

### C. The Confirmed Plan

On April 1, 2010, the Debtors filed a plan which included the modifications required by the Bankruptcy Court (the "Confirmed Plan").

On April 13, 2010, the Convert Committee filed an objection to the Confirmed Plan along with a motion to terminate Appellees' exclusivity under § 1121 of the Bankruptcy Code (Doc. No. 3279). (Appellees' Br. App. Ex. 9). The Convert Committee also proposed an alternative plan (the "Alternative Plan"). (Appellees' Br. App. Ex. 9 at Exs. A (1102-1190) and B (1191-1281)). Under the Alternative Plan, certain members of the Convert Committee would fund the payment of certain holders of senior notes ("Senior Noteholders"), and then "step into the shoes" of the Senior Noteholders in the reorganization. (Appellees' Br. App. Ex. 9 at 1091).

On April 15, 2010, the Convert Committee and the Gorman 401(k) appealed the April 1

Order, (Doc. Nos. 3312, 3320), and submitted a declaration claiming to offer new evidence

regarding the Debtors' valuation (the "White Declaration").  (Appellees' Br. App. Ex. 12).  The

Bankruptcy Court conducted a hearing on April 16, 2010 to consider the Confirmed Plan (the

"Confirmation Hearing").  During the Confirmation Hearing, Appellant did not dispute the

substantive modifications to the Confirmed Plan, but requested a continuance in order to petition

the Bankruptcy Court to review the Alternative Plan.  The Bankruptcy Court declined to revisit

the valuation determination, and the Convert Committee withdrew the White Declaration.

After hearing the parties' arguments, the Bankruptcy Court entered its <u>Findings of Facts,</u>

<u>Conclusions of Law, and Order Confirming Debtors' Second Amended Joint Plan of</u>

<u>Reorganization Dated April 7, 2010 (As Amended) Under Chapter 11 of the Bankruptcy Code</u>

(Doc. No. 3334) (the "Confirmation Order").  Appellant did not move for reconsideration of the

April 1 Order, or move to reopen the evidentiary record from the Confirmation Hearing.

**D. The Emergency Stay**

On April 27, 2010, Appellant appealed the Confirmation Order, (Doc. No. 3442), and

filed an emergency motion for a limited stay pending appeal of the Confirmation Order (Doc.

No. 3444) (the "Initial Stay Motion").  On April 30, 2010, the Bankruptcy Court denied the

Initial Stay Motion, but granted a temporary limited stay of certain actions under the Confirmed

Plan "<u>in order solely to allow the [District Court] an opportunity to consider the [requested</u>

<u>stay]</u>," (Doc. No. 3514).  (Appellees' Br. App. Ex. 19 at 1815) (emphasis added).

On May 3, 2010, Appellant filed an emergency motion in this Court seeking a stay of the

Confirmation Order (District Court Doc. No. 2).  The Court held a hearing on May 18, 2010

("the May 18 Hearing").  During that hearing, the Court denied Appellant's emergency motion

because Appellant failed to satisfy the requirements for a stay.  (Appellees' Br. App. Ex. 19) ("I

don't think that the appellants are likely to prevail on appeal."). On May 19, 2010, the Court issued an order denying the motion. (District Court Doc. No. 46). Appellant did not pursue its emergency motion before the Third Circuit, and took no other action to prosecute or expedite their appeal. The Court referred the matter to mediation on June 2, 2010.

### E.  The Order of Dismissal

On January 11, 2011, the Court entered an order requiring the parties to report the status of mediation. On January 18, 2011, Appellant filed a status report and proposed briefing schedule. (District Court Doc. Nos. 53, 54). On January 24, 2011, the Court entered an order dismissing Appellant's appeal without prejudice for failure to prosecute under Federal Rule of Civil Procedure 41(a). In the dismissal order, the Court noted that "the Mediation Status Report . . . fail[ed] to articulate a satisfactory reason why the parties did not submit briefing in support of their respective positions, or take any action to support their appeal for the six-month period between June 1, 2010 and January 18, 2011." (District Court Doc. No. 55 at 2). The Order nevertheless permitted Appellant to revive its appeal by filing a brief in support of their appeal by February 18, 2011. Appellant filed its opening brief for the appeal on February 18, 2011.

### F.  Implementation of the Confirmed Plan

Because the Court denied Appellant's emergency motion, and because Appellant's failed to appeal that decision, the Confirmation Plan became effective on May 10, 2010. During the nine months that elapsed between May 10, 2010 and February 18, 2011, a significant number of transactions occurred between Appellees, creditors, and other third parties pursuant to the Confirmed Plan. Those transactions include, but are not limited to: (1) closure of the Credit Facility, resulting in more than $425 million in cash proceeds; (2) payment of more than $633 million to holders of Appellees' pre-petition senior secured floating rate notes on account of their

claims; (3) cancellation of Appellees' pre-petition common stock and pre-petition debt securities; (4) issuance of $200 million in unsecured notes; and (5) repayment of $200 million to the Credit Facility. Appellees also closed a public offering of 6,750,000 shares of New Common Stock. Furthermore, numerous vendors, customers, and other persons and entities commenced, modified, or expanded their business relationships with Appellees in reliance on the Confirmed Plan. (Decl. of Randy Furr in Supp. of Appellees' Mot. to Dismiss App. Ex. 22 at ¶¶ 6-19).

On February 22, 2011, Appellees filed a motion to dismiss the appeal. (District Court Doc. No. 57). In the brief, Appellees' argued that the Court should dismiss the appeal under the doctrine of equitable mootness because the parties substantially consummated the Confirmed Plan. (Appellees' Br. in Supp. of Mot. to Dismiss, at 1). In response, Appellant argued that equitable mootness is inappropriate because the appeal does not ask the Court to overturn the Confirmed Plan. Instead, Appellant contends that the appeal petitions the Court to "overturn certain legal errors made by the Bankruptcy Court that would not impact or disrupt [the Confirmed Plan] . . . ." (Appellant's Br. in Opp'n to Mot. to Dismiss, at 1). Specifically, Appellant contends that the appeal affects the Bankruptcy Court's valuation determination and does not require the Court to unravel the entire reorganization plan.

## III. DISCUSSION

### A. Equitable Mootness

Under the doctrine of equitable mootness, "[a bankruptcy] appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." In re Continental Airlines, 91 F.3d 553, 559 (3d Cir. 1996) (quoting In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993) (internal quotation marks omitted)). The doctrine "prevents a court from unscrambling complex bankruptcy

reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001).

In order to determine whether to dismiss a bankruptcy appeal as equitably moot, the district court must consider: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." In re Continental, 91 F.3d at 560. Although "[t]hese factors are given varying weight, depending on the particular circumstances, . . . the foremost consideration is whether the reorganization plan has been substantially consummated." In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000). Moreover, the district court should approach the Continental factors in light of the public policy favoring the finality of bankruptcy judgments. Id.

Appellees argue that the Court should dismiss the appeal because the Continental factors heavily favor dismissal of the Confirmed Order. Appellees point to: (1) the lengthy bankruptcy court proceedings; (2) the fact that numerous parties conducted transactions in reliance on the finality of the Confirmed Plan; and (3) the fact that substantial alterations to the Confirmed Plan may significantly damage the rights of numerous third parties and jeopardize the success of the Confirmed Plan. Appellant argues that the Continental factors do not support dismissal of the Confirmation Order. Specifically, Appellants argue that because the appeal is limited to specific valuation issues, reversal of the Bankruptcy Court's order will not require the parties to unravel the Confirmed Plan. For the following reasons, the Court will dismiss the appeal.

### 1. Substantial Consummation

Whether a reorganization plan has been substantially consummated is "the foremost consideration" under the doctrine of equitable mootness.  Continental, 91 F.3d at 560.  The Bankruptcy Code defines "substantial consummation" as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).  If a court determines that the plan has been substantially consummated under 11 U.S.C. § 1101(2), the court must also decide whether "a reversal of the order confirming the Plan would put [the debtor] back into bankruptcy."  Continental, 91 F.3d at 561.  In other words, the Court must examine whether "the appeal, if successful, would unravel a fairly complicated reorganization plan."  In re Zenith, 329 F.3d 338, 345 (3d Cir. 2003) (citing Nordhoff, 258 F.3d at 186).

Appellees argue that the first Continental factor favors dismissal because "[t]he assets and business of Appellees re-vested in Appellees as reorganized debtors on [May 10, 2010]." (Appellees' Br. 10).  Appellees also assert that since that time, they managed their business and assets as reorganized debtors, and distributed hundreds of millions of dollars in cash and millions of shares of New Common Stock pursuant to the Confirmed Plan.  Appellant asserts that substantial consummation is a "red herring," because even if the parties substantially consummated the Confirmed Plan, the Court will not unravel the Confirmed Plan by granting Appellant the relief it seeks on appeal.  (Appellant's Br. 6).  Critically, Appellant acknowledges that the Confirmed Plan has been substantially consummated, but argues that the relief it seeks on appeal "will have no bearing on confirmation of the [Confirmed Plan]."  (Id.).

The Court finds that the first <u>Continental</u> factor favors equitable mootness because the Confirmed Plan has been substantially consummated. Since May 10, 2010, Appellees took substantial actions to revitalize their business. For example, between May 10, 2010 and February 2011, Appellees: (1) granted options to purchase 3,033,931 shares of New Common Stock; (2) closed a new $65 million revolving credit facility; (3) paid more than $633 million to holders of their pre-petition senior secured floating rate notes; (4) cancelled all of their pre-petition common stock and debt securities; (5) closed a public offering of 6,750,000 shares of New Common Stock; (6) issued $200 million in unsecured notes; (7) repaid $200 million of the Credit Facility; and (8) completed the Rights Offering, resulting in $109 million in cash proceeds. (Appellees' Br. 8). Moreover, Appellees amended all of their governing documents, replaced their board of directors, and began managing the company as reorganized debtors. Thus, debtors substantially consummated the reorganization plan.

Additionally, the plan is not so "simple" that it can be "easily reversed." <u>Nordhoff</u>, 258 F.3d at 186. In <u>Nordhoff</u>, the appellants, a creditor and a committee of equity holders, challenged a reorganization plan, arguing that the bankruptcy court relied on an incorrect valuation of the debtor's assets in approving the reorganization plan. <u>Id.</u> at 184. The debtor moved to dismiss the appeal on the basis of equitable mootness. The major features of the reorganization plan included: "1) exchanging approximately $103 million in bonds bearing interest at 6.25 percent for $50 million in new bonds bearing interest at 8.19 percent; 2) canceling [the debtor's] stock for no consideration; 3) issuing new [] stock . . . in exchange for $200 million of debt relief forgiving debt owed to [the creditor]; 4) extending a new $60 million credit facility to [the debtor]; 5) canceling approximately $175 million in additional debt owed to [the creditor] in exchange for $135 million of new debt and ownership of [the debtor's]

television plant in Reynosa, Mexico; 6) refinancing of debt owed to a consortium of banks . . . ; 7) no alteration of debt owed to trade creditors; and 8) releasing [the creditor], [the debtor's] directors and officers, and [a] Bondholder's Committee from potential liability to [the debtor] or certain creditors." Id. at 182. During the reorganization, the bankruptcy court valued the debtor at $300 million, over the appellants' objection that the appropriate value of the debtor was $1.05 billion. Id. at 183.

During the appeal of the bankruptcy court's order, the district court determined that the first Continental factor favored equitable mootness. The district court determined that although feasible, unraveling the reorganization plan would be difficult and inequitable. Id. at 186. After examining the complexity of the reorganization plan, the district court concluded:

> Although some of the [reorganization] Plan transactions could conceivably be "reversed," this would not be easy to accomplish, and other transactions may not be reversible at all. This factor, therefore weighs heavily in favor of dismissal, at least to the extent that the court could not fashion relief that would not result in the dismantling of the plan.

In re Zenith Elecs. Corp., 250 B.R. 207, 214 (D. Del. 2000), aff'd, 258 F.3d 180 (3d Cir. 2001). The Court also noted that although many of the features of the reorganization plan were reversible, "the exchange of [the] bonds . . . present[ed] a more difficult problem." Id. at 214. The Court further noted that because "[t]he bonds [were] publicly traded," reversing the bond exchange "would almost certainly impact the rights of investors that were not involved in the bankruptcy proceedings." Id.

The Third Circuit affirmed. Regarding the issue of substantial consummation, the Third Circuit stated:

> Although the plan here is not as complex as the plan in Continental Airlines, it is hardly simple. The plan required eighteen months of negotiation between several parties regarding hundreds of millions

of dollars, restructured the debt, assets, and management of a
major corporation, and successfully rejuvenated [the debtor].
Appellants have not offered any evidence that the plan could be
reversed without great difficulty and inequity, and we have reason
to believe that the bond redistribution is unretractable.

Nordhoff, 258 F.3d at 186.

Similar to the reorganization plan in Nordhoff, which involved extensive negotiations
between several parties regarding millions of dollars of restructured debt and the management of
a major corporation, here, the Confirmed Plan is the product of over fourteen months of
negotiation and complex financial transactions.  As Appellees note in their brief, the following
transactions occurred pursuant to the Confirmed Plan after May 10, 2010:  (1) Appellees' old
stock, notes and other debt instruments were cancelled, (2) Appellees repaid more than $630
million to holders of secured claims, (3) Appellees distributed over 31 million shares of New
Common Stock and distributed millions of dollars in cash; (4) Appellees consummated a $109.4
million Rights Offering; (5) Appellees replaced their board of directors; and (6) numerous parties
began trading Appellees' New Common Stock on the NYSE.  Thus, the Confirmed Plan is at
least as complex as the reorganization plan in Nordhoff.  Moreover, just as the Third Circuit
acknowledged in Nordhoff that unraveling a debt exchange is difficult when bonds are publicly
traded, here, unraveling the Confirmed Plan is extremely difficult because the New Common
Stock is actively traded on the NYSE.  Therefore, because the Bankruptcy Court cannot unravel
the Confirmed Plan without substantial difficulty and prejudice to numerous investors and other
third parties, the first Continental factor favors equitable mootness.

Appellant's argument that the appeal "will have no bearing on confirmation of the
[Confirmed Plan]" is unavailing.  As a threshold matter, the Court notes that Appellant argues
that it "merely seeks remand by [sic] to the Bankruptcy Court for reconsideration of certain

valuation conclusions, that have no bearing on confirmation of Appellees' plan, based on evidence not previously considered by the Bankruptcy Court." (Appellant's Br. at 6). However, that is an incorrect description of the issues on appeal. On April 29, 2010 and May 11, 2010, Appellant submitted a list of twenty-five issues for appeal. Many of those issues relate to the Bankruptcy Court's valuation. However, Appellant challenges other issues, such as whether Appellees satisfied the good faith requirements of § 1129(a) of the Bankruptcy Code.[4] Thus, the

---

[4] In particular, the Statement of Issues on Appeal that Appellant submitted on April 29, 2010 raises the following issues:

> Did the Court err as a matter of fact and law in finding in the April 16, 2010 Order that the Debtors satisfied the <u>good faith requirements of Section 1129(a)(3) of the Bankruptcy Cod</u>e in connection with the April 7, 2010 Plan?

> Did the Court err as a matter of fact and law in confirming a plan of reorganization for the Debtors that would result in the holders of Class 5A Claims receiving more than the full amount of their allowed claims, <u>in violation of Section 1129(b) of the Bankruptcy Code</u>?

> Did the Court err as a matter of fact and law when it concluded in the April 1, 2010 Opinion, the April 1, 2010 Order and the April 16, 2010 Order that the Debtor's Plan <u>treated the holders of Class 5C Claims fairly and equitably as required under Section 1129(b) of the Bankruptcy Code</u>?

(Appellees' Br. App. Ex. 18, at 7-9) (emphasis added). The Statement of Issues on Appeal Appellant submitted on May 11, 2010 identifies the following issues:

> Whether the Bankruptcy Court erred as a matter of fact and/or law in entering its April 16, 2010 <u>Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Second Amended Joint Plan of Reorganization Dated April 7, 2010 (as Amended) Under Chapter 11 of the Bankruptcy Code</u> (the "April 16 Confirmation Order").

> Whether the Bankruptcy Court erred as a matter of fact and/or law in finding the April 16 Confirmation Order that the Debtors satisfied the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code in connection with the April 7 Plan.

> Whether the Court erred as a matter of fact and/or law when it concluded in the April 16 Confirmation Order that the April 7 Plan complies with the requirements of Section 1129(b) of the Bankruptcy Code, does not violate the absolute priority rule and is fair and equitable with respect to Class 5C.

(Appellees' Br. App. Ex. 20, at 8-10) (emphasis added).

Court notes that the appeal does not simply address the Bankruptcy Court's valuation but instead challenges a variety of issues central to the Confirmation Plan.[5]

Moreover, the Court notes that even if, as Appellant argues, the appeal challenges only the Bankruptcy Court's valuation, the first <u>Continental</u> factor favors equitable mootness. "If the relief an appellant requests has an 'integral nexus' with the reorganization plan such that it would cause the 'reversal or unraveling' of the plan, then dismissal of the appellant's appeal on the grounds of equitable mootness is favored." <u>In re Genesis</u>, 280 B.R. 339, 346 (D. Del. 2002) (citing <u>In re Trans World Airlines, Inc.</u>, No. 01-56, 2002 WL 500569, at *2 (D. Del. Mar. 26, 2002)). A challenge to a bankruptcy court's valuation is a challenge to the "very centerpiece of the plan." <u>See</u> <u>Nordhoff</u>, 258 F.3d at 189 (noting that valuation of debtor was the "very centerpiece of the plan."); <u>In re Genesis</u>, 280 B.R. at 346 (noting appellant's argument "rests on the premise that the valuation that the Bankruptcy Court based confirmation on is too low such that the Plan is not fair and equitable," and noting that granting debtor's proposed relief would "likely topple the delicate balances and compromises struck by the Plan."). The appeal raises the issue of whether the Bankruptcy Court's valuation was fair to Appellant. If the Court determines that the Bankruptcy Court's valuation was unfair or inequitable with respect to Appellant, the Confirmed Plan is not fair and equitable to other unsecured creditors. <u>See</u> <u>In re Genesis</u>, 280 B.R. at 346 ("Appellant's substantive argument rests on the premise that the valuation . . . is too low such that the Plan is not fair and equitable. If Appellant's argument is accepted as true, the Plan would not be fair and equitable for all of the Debtors' unsecured creditors, not just Appellant. Such a finding would doubtless result in the need to negotiate a new plan."). Thus, a

---

[5] The Court notes that a challenge to the good faith requirement under § 1129(a)(3) significantly impacts the Confirmation Plan because the good faith requirement is "a condition of plan confirmation." <u>See</u> <u>In re Combustion Engineering, Inc.</u>, 391 F.3d 190, 246 (3d Cir. 2004) ("As a condition of plan confirmation, a debtor must propose a plan of reorganization 'in good faith and not by any means forbidden by law.'") (citing 11 U.S.C. § 1129(a)(3)).

determination that the valuation was unfair, "would doubtless result in the need to negotiate a new plan."  Id.

Moreover, granting Appellant the relief it seeks on appeal would require the Court to alter its general distribution scheme.  Since the Effective Date, millions of shares of New Common Stock have been distributed to holders of Senior Notes and other creditors.  In addition, the New Common Stock has been traded by numerous parties over the NYSE.  In order to grant Appellant the relief it seeks, the Court must order Appellees to collect the New Common Stock and redistribute distributions to the holders of Senior Notes and Convertible Notes.  However, the Court cannot recover those distributions and allocate them to Senior and Convertible noteholders without imposing a new reorganization plan on Appellees.  As Appellees correctly note in their Reply Brief, "requiring holders of Senior Notes to disgorge proceeds and any recovered New Common Stock to the holders of Convertible Notes would create an unmanageable situation."  (Appellees' Reply Br., at 6).

Therefore, because the Confirmed Plan has been substantially consummated, and granting Appellant the relief it seeks would be difficult and inequitable, the first Continental factor favors equitable dismissal.

### 2.  Whether a Stay has been Obtained

"The existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of mootness."  In re Grand Union Co., 200 B.R. 101, 105 (D. Del. 1996).  Thus, in the Third Circuit it "is obligatory upon [the] appellant [in a bankruptcy proceeding] . . . to pursue with diligence all available remedies to obtain a stay of execution of the objectionable order . . . , if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."  Nordhoff, 258 F.3d at 186-87 (citation and internal quotation

mark omitted).  Moreover, the absence of a stay is so critical to the analysis that even the unsuccessful pursuit of a stay may favor a finding of equitable mootness.  See Continental, 91 F.3d at 562 ("'[A] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.'") (quoting In re UNR Indus., Inc., 20 F.3d 766, 770 (7th Cir. 1994)).

Appellees argue that the second Continental factor favors equitable mootness because Appellant failed to obtain a stay in both the Bankruptcy Court and this Court.  Appellees also highlight the fact that Appellant failed to seek a stay from the Third Circuit or otherwise prosecute its appeal for a period of nine months prior to filing its opening brief on February 18, 2011.  Appellant asserts that it sought a stay, but that this Court denied the stay because it determined that "failure to grant a stay would not render the Appellant's appeals equitably moot."  (Appellant's Br. at 7).  In support of that assertion, Appellant points to the following statement made by the Court regarding Appellant's motion to stay:  "If the Court agrees you're correct [on appeal], it has the ability as a court of equity to give the money back from the 5A class."  (Tr. May 18 Hearing, at 20:15-17).

The second Continental factor favors equitable mootness.  First, Appellant failed to obtain a stay from both the Bankruptcy Court and this Court, and decided not to pursue a stay from the Third Circuit.  After the Court referred the case to mediation in May 2010, Appellant failed to report the status of mediation or otherwise prosecute its case.  The case effectively remained dormant for seven months before the Court reached out to the parties to determine the status of mediation.  Thus, Appellant failed to "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order."  Nordhoff, 258 F.3d at 186-87.

Second, Appellant's argument that the Court denied the stay because it determined that "failure to grant a stay would not render the Appellant's appeals equitably moot" does not compel a different result. Appellant's underlying assumption – that the "Court determined not to grant the stay . . . in large part, precisely because failure to grant a stay would not render Appellant's appeals equitably moot" – is unpersuasive. In denying the stay, the Court did not grant Appellant an unfettered right to appeal the Bankruptcy Court's order in perpetuity. The equitable mootness doctrine acknowledges that at some unspecified point in time it becomes difficult, time-consuming, and inequitable to unravel a plan of reorganization and impose a new reorganization plan on the parties. See Nordhoff, 258 F.3d at 185 (noting that equitable mootness doctrine "prevents a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract."). Notwithstanding the Court's statement nine months ago, that time has arrived.

Moreover, Appellant conveniently ignores the posture of the proceedings when the Court stated that it could "give the money back from the 5A class." (Tr. May 18 Hearing, at 20:15-17). The Court made that statement on May 18, 2010 – approximately nine months before Appellees' filed the present motion. There is no indication that the Court intended to preclude the possibility that subsequent events and transactions could render Appellant's appeal equitably moot. The Court simply acknowledged that it could require some of the creditors who received cash or stock to return those funds. However, there is no evidence that the Court intended to preclude dismissal of the appeal on the basis of equitable mootness. Thus, Plaintiff's reliance on a single statement by the Court in the May 18 Hearing suggesting that the Court could simply give money back to the 5A class is misplaced.

### 3. Whether the Relief Requested would Substantially Affect the Rights of Parties Not Before the Court

Third-party reliance on the finality of a plan confirmed by a bankruptcy court is "[h]igh on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated bankruptcy reorganization . . . ." Continental, 91 F.3d at 562. In considering this factor, the Third Circuit has stated:

> Our inquiry should not be about the "reasonableness" of the Investors' reliance on the probability of either party succeeding on appeal. Rather, we should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the [Bankruptcy] Code itself, clearly weighs in favor of encouraging such reliance.

Id. at 565. Thus, investor reliance on confirmation orders "may be the central animating force behind the equitable mootness doctrine." Id.

Appellant argues that the third Continental factor favors mootness because the only party who acted in reliance of the Confirmed Plan are "the holders of Senior Notes that received shares of new Spansion Common Stock that, in the absence of the Bankruptcy Court's legal error, would otherwise have been distributed to holders of Convertible Notes." Appellant is incorrect.

There are numerous third parties who relied on the Confirmed Plan, and a substantial alteration to the Confirmed Plan would undoubtedly affect their rights. First, Appellees distributed 14,354,148 shares of New Common Stock to holders of the Senior Notes, and over 31.5 million shares of New Common Stock to holders of Class 5A and Class 5B claims. Every creditor and investor that received a distribution relied upon the finality of the Confirmed Order. See In re Dura Auto Sys., 403 B.R. 300, 307 (D. Del. 2009) (dismissing bankruptcy appeal as equitably moot based, in part, on finding that requested relief would "adversely affect . . . third

parties that have acted in reliance on the plan's confirmation, including . . . stockholders that received (and possibly traded) new common stock or preferred stock expecting that stock to be marketable . . . ."). A determination that the Confirmed Plan is void, or a substantial alteration to the Confirmed Plan undoubtedly affects the rights of all holders of New Common Stock.

Second, a significant change to the Confirmed Plan implicates the rights of numerous third parties other than the original recipients of the New Common Stock. For example, millions of shares of New Common Stock were – and presumably continue to be – traded on the NYSE. Numerous "vendors, customers and other persons and entities have commenced, modified or expanded their business relationships with Appellees in reliance on the Confirmed Plan and the successful conclusion of Chapter 11." (Appellees' Br. 8). The changes to the Confirmed Plan Appellant proposes implicates the rights of all those third parties. See Nordhoff, 258 F.3d 188-89 (bond-holders or stockbrokers who acquired Appellees' securities after the effective date of confirmed plan); Continental, 91 F.3d at 562-63 (third-party investors); Dura, 403 B.R. at 307 (customers, suppliers, and other vendors who committed resources to the reorganized debtor); and In re Box Bros. Holding Co., 194 B.R. 32, 42 (D. Del. 1996) (creditors who relied on the confirmed plan); In re Genesis, 280 B.R. at 345 (noting that more than 1,800,000 shares of the reorganized debtor were traded pursuant to the reorganization plan, and finding that "[t]he rights of these third party investors would be directly affected by the relief Appellant seeks, because the distribution of additional shares to Appellant would result in the dilution of the shares these investors currently hold.").

Finally, as Appellant notes in its brief, the appeal affects the rights of all Senior Noteholders in this bankruptcy. (Appellant's Br. 2) ("Such stock instead was issued to holders of Senior Notes, in accordance with the subordination provisions of the indenture relating to the

convertible notes, because of the Bankruptcy Court's legal errors with respect to valuation."). However, it is unclear whether the Convert Committee represents all of the individual Senior Noteholders that have claims to Appellees' assets. Thus, to the extent that there are individual Senior Noteholders who are not part of the Convertible Committee, their interests are not represented in this appeal. Moreover, it is unclear whether the Convertible Committee has the authority to bind <u>all</u> of the individual Senior Noteholders who are not before the Court. <u>See In re Genesis</u>, 280 B.R. at 345 ("Although the agents of the Exit Lenders and the Senior Secured Lenders are before the Court, the actual lenders are not and the agents may not be able to bind the lenders they represent in all respects as a result of the terms of their respective credit agreements.").

Therefore, because the relief Appellant seeks on appeal will undoubtedly affect the rights of numerous parties who are not before the Court, the third <u>Continental</u> factor favors equitable mootness.

### 4. Whether the Relief Requested by Appellant Would Affect the Success of the Confirmed Plan

Under the fourth <u>Continental</u> factor, a court should dismiss a bankruptcy appeal as equitably moot "if the relief requested . . . would jeopardize the success of the reorganization plan by causing its 'reversal or unraveling' . . . ." <u>In re Genesis Health Ventures, Inc.</u>, 204 F. App'x 144, 146 (3d Cir. 2006). A bankruptcy appeal will jeopardize the success of a reorganization plan if granting the requested relief: (1) "effectively 'impos[es] a different plan of reorganization on the parties,'" <u>Dura</u>, 403 B.R. at 307; or (2) "'create[s] an unmanageable, uncontrollable situation for the Bankruptcy Court,'" <u>id.</u> (quoting <u>In re Quality Spice Corp.</u>, 107 B.R. 843, 855 (D.N.J. 1989)). In effect, the court should consider "whether [the appellant] seek[s] to knock the props out from under the authorization for every transaction that has taken

place" pursuant to the reorganization plan.  <u>Nordhoff</u>, 258 F.3d at 189 (internal citations and quotation marks omitted).

Appellant argues that the fourth <u>Continental</u> factor does not favor equitable mootness because the Court can "fashion a remedy on . . . appeal[] without affecting Appellees['] [reorganization] plan."  (Appellant's Br. 8).  In support of that argument, Appellant cites to the following statement the Court made at the May 18 Hearing:

> So we know how much each person got in terms of number of shares.  We know how much its worth.  We – a court can figure out if you're right and Mr. White is right and whoever else you want to use to make the point.  We know how much of that they shouldn't have gotten and how much they should have gotten if you're right.  So we take the part that they shouldn't have gotten and make them give it back.

<u>Id.</u> (citing Appellant's Br. App. Ex. A. Tr. May 18, 2010, 21:22-25, 22:1-3).  Appellees contend that the fourth <u>Continental</u> factor favors equitable mootness because the appeal attacks the Bankruptcy Court's valuation, which implicates the Confirmed Plan's general distribution scheme.  Appellees also argue that the Court's decision regarding Appellant's motion to stay "was not a determination that Appellant would indeed have any practical and equitable remedy in the Appeals, particularly ten months after the Confirmed Plan had been substantially consummated . . . ."  (Appellees' Br. 7).  To support that assertion, Appellees point to the following statement by the Court in the May 18 Hearing:  "I'm not making any determination in advance whether equitable mootness will work or not.  It's an issue and we'll see how it goes." <u>Id.</u> (citing Answering Br. Ex. A 46:11-17).

The Court finds that the fourth <u>Continental</u> factor favors equitable mootness.  The appeal attacks the substance of the Confirmed Plan in two ways.  First, Appellant seeks to change the Bankruptcy Court's valuation.  Second, the appeal challenges Appellees' compliance with the

good faith requirement contained in section 1129 of the Bankruptcy Code. With respect to the first issue, courts in this Circuit have held that a challenge to a bankruptcy court's valuation strikes at the very heart of a proposed reorganization plan. See Nordhoff, 258 F.3d at 189-90 (noting that appeal of bankruptcy court valuation challenged "the very centerpiece of the plan," and effectively sought "nothing less than a wholesale annihilation of the Plan . . . .") (quoting In re Manges, 29 F.3d 1034, 1043 (5th Cir. 1994)); In re Genesis, 280 B.R. at 346 (finding that alteration to bankruptcy court's valuation would "topple the delicate balances and compromises struck by the Plan."). Here, the Bankruptcy Court's determination that the enterprise value of Appellees ranged from $872 million to $944 million was an integral part of the overall reorganization plan. The Bankruptcy Court's valuation directly affects the general distribution scheme because Appellees issued millions of dollars worth of New Common Stock and unsecured notes pursuant to that valuation. Thus, changing the Bankruptcy Court's valuation ultimately jeopardizes the entire bankruptcy reorganization plan.

Moreover, displacing the Confirmed Plan with the Alternate Plan makes any reorganization of Appellees' assets unmanageable because it requires holders of Senior Notes to relinquish stock to holders of Subordinated Notes in exchange for a cash payment. In order for Senior Noteholders to relinquish stock to holders of Subordinated Notes, the Court must recover millions of dollars worth of payments in stock to holders of Senior Notes and transfer those payments to holders of Subordinated Notes. See Dura, 403 B.R. at 307 (noting that "to grant appellant's relief would require . . . recovering distributions of 7,234,060 shares of new common stock made to senior notes claimants and redistributing those shares among senior notes claimants and subordinated notes claimants.").

Appellant's second challenge threatens to invalidate the Confirmed Plan wholesale.  If, as Appellant argues, Appellees' proposed the Confirmed Plan in bad faith, then the Court must reopen numerous negotiations with creditors and other parties involved in the bankruptcy proceedings in order to reach an agreement concerning Appellees' obligations.  This additional change would unravel the reorganization plan.

Appellant's reliance on the Court's statement at the May 18 Hearing is misplaced.  First, the Court made clear that it did not intend to decide the issue of equitable mootness at the May 18 Hearing.  Thus, Appellant's argument that the Court intended to preclude a subsequent finding of equitable mootness is baseless.  Second, Appellant failed to prosecute or expedite the appeal for approximately nine months after the Court refused to grant Appellant's request for a stay.  Thus, assuming arguendo that the Court could have unraveled the Confirmed Plan during the course of the appeal, Appellant unnecessarily made unraveling the plan unmanageable and inequitable by delaying prosecution of the appeal.

Therefore, because granting Appellant the relief it requests would significantly impair the success of the Confirmed Plan, the Court finds that the fourth Continental factor favors equitable dismissal.

### 5. Whether Public Policy Favors Dismissal

"The public policy of affording finality to bankruptcy judgments is . . . the lens through which the other equitable mootness factors should be viewed."  Nordhoff, 258 F.3d at 190.  In Continental, the Third Circuit noted that there is a "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization" in bankruptcy proceedings.  91 F.3d at 565.  The Court noted that "the importance of allowing approved reorganizations to go forward

in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine." Id.

Appellant argues that the fifth Continental factor favors equitable mootness because "[t]here is a significant public policy consideration that lies in the correct application of the law." (Appellant's Br. 9). In particular, Appellant asserts that "the principal that a senior creditor may not recover more than 100% of the allowed amount of its claim - - is directly implicated by virtue of the Bankruptcy Court's legal errors." (Id.).

The Court agrees that the correct application of the law is a significant public policy consideration, but finds that the correct application of the law in this case compels dismissal of the appeal on the basis of equitable mootness. As previously mentioned, this bankruptcy involved lengthy negotiations, extensive litigation, and numerous contracts between Appellees, creditors, and other third parties who acted in reliance upon the Confirmed Plan. Furthermore, since May 2010, the parties substantially consummated the Confirmed Plan. Because of the large number of parties involved in the bankruptcy and the substantial effort dedicated to negotiating and implementing the Confirmed Plan, the fifth Continental factor heavily favors equitable mootness.

## IV. CONCLUSION

For the foregoing reasons, the Appellant's appeal is dismissed as equitably moot. An appropriate Order shall issue today.

Dated: 8/4/2011                                        /s/ Robert B. Kugler
                                                       ROBERT B. KUGLER
                                                       United States District Judge